**VISITING NURSE ASSOCIATION OF BROOKLYN, et al., Plaintiffs,**

v.

**Tommy G. THOMPSON, et al., Defendants.**

**No. 99CV7564 NGG/CLP.**

United States District Court, E.D. New York.

Dec. 7, 2004.

Connie A. Raffa, David N. Wynn, John Thomas Vaughan, III, Arent Fox, PLLC, New York, NY, Robert E. Wanerman, Arent Fox Kintner Plotkin & Kahn, PLLC, Washington, DC, for Plaintiffs.

Kathleen Anne Mahoney, United States Attorneys Office, Brooklyn, NY, for Defendants.

## MEMORANDUM & ORDER

GARAUFIS, District Judge.

Before this court are the motions of the plaintiffs, Visiting Nurse Association of Brooklyn ("VNAB") and Visiting Nurse Association Health Care Services, Inc. ("VNAHCS") for summary judgment and declaratory relief. If granted, these motions would overturn the decision of the Secretary of Health and Human Services ("Secretary"), who has denied the plaintiffs' request for additional reimbursement under the Medicare program for home health services provided during 1995 and 1996, and direct the Secretary to employ the reimbursement methodology in the manner urged by VNAB and VNAHCS (collectively, "the Providers") for all subsequent years.

Simultaneously before the court are the motions of the defendants, Tommy G. Thompson in his official capacity as Secretary of the Department of Health and Human Services, Mark McClellan, M.D., likewise in his official capacity as Administrator of the Centers for Medicare and Medicaid Services ("CMS"), and United Government Services ("UGS"). The defendants have moved for summary judgment on the plaintiffs' claims, as well on the defendants' cross-claims for damages under the False Claims Act, 31 U.S.C. §§ 3729(a)—3733 and several common-law causes of action.

Distilled to its essentials, this litigation is a dispute over the validity of Provider Reimbursement Manual ("PRM") § 3205. This provision, which was issued as an interpretation of the cost-reporting regulations contained in 42 C.F.R. § 413.53, instructs home health aide services providers to include only "Medicare-type" services in reporting the costs of services rendered to non-Medicare patients for the purpose of securing reimbursement for home health services rendered to Medicare beneficiaries. PRM § 3205 was issued in May 1995 in response to the discovery that some institutions providing home health aide services to Medicare beneficiaries were including in their cost reports visits to non-Medicare patients far longer, and thus more expensive, than the visits covered by the Medicare program. This finding was of concern to Medicare administrators because the initial step in the formula by which Medicare reimbursement levels for individual health home aide visits performed by a given institution is to find the average cost of all home aide visits provided by that institution. Thus, any increase in the reported cost of providing services to non-Medicare beneficiaries has the effect of increasing the compensation paid to provider institutions on behalf of Medicare beneficiaries as well. Believing that some institutions were systematically over-reporting the costs associated with providing home health aide services to non-Medicare beneficiaries, and were thereby shifting costs onto the Medicare program, the Secretary

decided to issue PRM § 3205 to prevent such cost-shifting. On this much, at least, the parties agree.

The parties disagree sharply, however, about the relationship between the then-existing regulations governing Medicare reimbursement submissions and § 3205, and therefore the validity of § 3205. The Providers claim that this regulatory interpretation linked Medicare cost-reporting and coverage principles for the first time, and in so doing effected a substantial change in the reimbursement methodology governing the provision of home health aide services. This change was so substantial, and so incompatible with the existing, duly promulgated regulations, they argue, that it constituted an exercise of the Secretary's lawmaking powers. Such exercises, the Providers assert, are invalid unless carried out in accordance with the notice-and-comment provisions of the Administrative Procedures Act ("APA"). Since it is undisputed that PRM § 3205 was enacted without notice and comment, the Providers conclude, the Secretary's decision to deny in part the Providers' reimbursement claims for 1995 and 1996 on the basis of that interpretation was likewise invalid, and must be set aside by this court.

The defendants, in contrast, contend that the PRM provision is an interpretive rule, and therefore exempt from the notice and comment requirements of the APA. Because the interpretation was validly issued, they argue, the Providers were obligated to comply with its terms in filing their cost reports for 1995 and 1996, and the Secretary acted lawfully in denying a portion of the Providers' claims pursuant to the terms of that interpretation. Furthermore, the defendants argue, because the Providers submitted cost reports for reimbursement while knowingly failing to comply with the terms of the 1995 PRM, their submissions were false within the meaning of the federal False Claims Act, thus making the Providers subject to fines and treble damages under that statute.

On October 21, 2003, the original motion and cross-motions of the parties were referred to Magistrate Judge Cheryl L. Pollak for a Report and Recommendation ("Report"). On August 27, 2004, Judge Pollak issued a comprehensive, fifty-two page Report, in which she concluded: (1) that the motions for summary judgment and declaratory relief filed by the Providers should be denied; and (2) that the defendants' motion for an order affirming the Secretary's final decision and cross-motion for summary judgment on the False Claims Act and common law claims should be granted. The Providers submitted a lengthy and timely statement of objections to the Report, to which the defendants timely replied. The court now considers the Providers' objections, reviewing *de novo* the facts and conclusions of law adopted by Judge Pollak in accordance with 28 U.S.C. § 636(b)(1) and Fed. R.Civ.P. 72(b). For the reasons discussed below, the conclusions of Report are adopted in full, and this action is referred back to Judge Pollak for further consideration of the defendants' claims for damages.

## I. Factual Background

### A. *The Parties*

The VNAB is a home health agency located in Brooklyn. (Pls.' 56.1 Stmnt ¶¶ 1, 2).[1] The Secretary of HHS, who is charged with administering the Medicare

---

1. Citations to "Pls.' 56.1 Stmnt" refer to the Plaintiffs' Statement of Material Facts That Are Not in Dispute, dated April 6, 2000.

program, has certified VNAB to provide home health services to eligible Medicare beneficiaries. (*Id.* ¶ 2). VNAHCS is also a home health agency located in Staten Island and certified by the Secretary to provide such services to Medicare beneficiaries. (*Id.* ¶¶ 3–5). Home health agencies provide, among other things, home health care services, which are defined as part-time or intermittent nursing care and other therapeutic services provided in a residential setting by a certified home health aide who must successfully complete a training program approved by the Secretary. 42 U.S.C. § 1395x(m). Both the VNAB and VNAHCS are organized as not-for-profit corporations under New York law and have been operating for 110 and 82 years, respectively. (*Id.* ¶¶ 1, 3). At the time the motion was filed,[2] the HCFA was the agency within the Department of Health and Human Services that administered the Medicare program and UGS is a regional home health fiscal intermediary under contract with the Secretary to evaluate and authorize payment of claims for home health services, pursuant to 42 U.S.C. § 1395h.

### B. *The Medicare Program—Home Health Aides*

In 1965, as part of the Social Security Act, Congress established the Medicare program of health insurance for the elderly and disabled. 42 U.S.C. §§ 1395–1395ggg. Pursuant to statute, medical services are divided into three categories: Part A of the statute covers inpatient hospital services, skilled nursing services, home health care services, and hospice care, 42 U.S.C. §§ 1395c—1395i–5; Part B covers outpatient hospital and other health services, 42 U.S.C. §§ 1395j –1395w–4;

and Part C deals with the delivery of Medicare services through managed care plans.

At issue in this litigation is the methodology for reimbursement of home health aide services under Part A. Home health aides provide personal care services, such as bathing, grooming, dressing, feeding, catheter and colostomy care, wound care and the administration of certain types of medication, when necessary to maintain a person's health or to facilitate treatment. *See* 42 C.F.R. §§ 409.44–409.45, 484.36(c)(2). Other services incidental to those described, such as preparing light meals or changing bed linens, are also provided by home health aides. 42 C.F.R. § 409.45(b)(4). The services must be ordered by the patient's physician in circumstances where the patient cannot perform the services himself and either has no caregiver at all or has a potential caregiver but is unwilling to use that person's services. 42 C.F.R. §§ 409.42, 409.45(b)(3).

Under Part A of the Medicare provisions, VNAB and VNAHCS have entered into provider agreements with the Secretary that authorize them to provide skilled nursing services, medical social services, home health aide services, speech language pathology services, and physical and occupational therapy to Medicare recipients. 42 U.S.C. § 1395cc. These provider agreements specify the services to be provided, and the regulations that govern participation and reimbursement from the program. 42 C.F.R. §§ 489.1–489.28; *see Binghamton Gen. Hosp. v. Shalala*, 856 F.Supp. 786, 789 (S.D.N.Y.1994).

### C. *The Reimbursement Procedure*

In order to receive reimbursement for home health aide services, the home health

---

**2.** As noted in footnote 3 *supra,* HCFA has been renamed CMS. Thus, although defendants dispute the accuracy of paragraph 7 of plaintiffs' 56.1 Statement because of a change in the name of the official who administers the agency, they concede that this is not a material fact in dispute requiring a trial. (Defs.' 56.1 Stmnt ¶ 7).

agency is required to submit claims for reimbursement to the fiscal intermediary, which evaluates the claims and pays them in accordance with certain criteria set forth in 42 C.F.R. §§ 409.42 and 409.45(b). *See Neiman v. Sec'y of the Dep't of Health & Human Sery's*, 722 F.Supp. 954, 955 (E.D.N.Y.1988). Among other things, the Medicare beneficiary must be confined to home under a doctor's care, the reason for the visits must be to provide personal services to the patient which are ordered by the doctor, provided on a part-time or intermittent basis, and the services must be reasonable and necessary. 42 C.F.R. § 409.45(b)(1)-(3). Reimbursement is not authorized for "items or services—which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

Claims submitted under the provider agreements are paid on an interim basis throughout the year as the services are provided, based on reimbursement rates established for the previous year. 42 C.F.R. § 413.64(e). In the alternative, the fiscal intermediary may make biweekly periodic interim payments ("PIPs"), computed based on the approximate cost of covered services delivered. 42 C.F.R. § 413.64(h)(2)(iv). The interim payments are subject to reconciliation in the annual cost report, which each home health agency is required to submit to the fiscal intermediary within five months of the close of the agency's cost reporting year. 42 C.F.R. §§ 413.20(b), 413.24(f)(2). This report is used by the fiscal intermediary to reconcile all payments made to the home health agency during the preceding year, 42 C.F.R. § 413.20, and the cost report submitted for the prior year is used to approximate the costs of services paid for in the interim payments for the following year. 42 C.F.R. § 413.64. Pursuant to Form HCFA–1728–94, the home health agencies are required to certify that their cost reports are prepared "in accordance with applicable instructions."

Following its review and audit of the annual cost report, the fiscal intermediary issues a Notice of Program Reimbursement ("NPR"), which sets forth the fiscal intermediary's final determination, identifying any adjustments, any amounts of overpayment and detailing the rationale for its conclusions. 42 C.F.R. §§ 413.60, 405.1803(a)-(b). If it is determined that a provider has been overpaid, the NPR is used to adjust the provider's payments to recover the amounts of overpayment. 42 C.F.R. § 405.1803(c).

If the home health agency is not satisfied with the NPR, and the amount in controversy is $10,000 or more, the claim may be appealed to the Provider Reimbursement Review Board ("PRRB"), 42 U.S.C. § 1395oo; 42 C.F.R. §§ 405.1835— 405.1841, which is empowered to hold an adversary proceeding, at which both the agency and the fiscal intermediary are represented, and where evidence and testimony may be presented. 42 C.F.R. § 405.1851.

The PRRB decision becomes final unless the Secretary's delegate, the HCFA Administrator, elects to review the decision. 42 C.F.R. § 405.1871. The Administrator may affirm, reverse or modify the PRRB's determination, but, in any event, his decision becomes the Secretary's final determination, which is subject to judicial review. 42 U.S.C. § 1395oo(f)(1). *See Neiman v. Sec'y of the Dep't of Health & Human Serv's*, 722 F.Supp. at 955.

### D. *The Regulations at Issue*

Under Part A, a home health agency may be reimbursed for an unlimited number of covered home health aide visits, 42

C.F.R. § 409.48(a), based on the agency's cost per visit as determined from the annual cost report. 42 C.F.R. §§ 413.20(b), 413.24(f). Medicare's reimbursement is for the "reasonable cost" as determined based on standards promulgated by the Secretary of HHS. 42 U.S.C. § 1395(f)(b); *see also* 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. Part 413, Subparts A to G. "Reasonable cost" includes all "necessary and proper costs" incurred, including administrative costs which are defined as "appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 C.F.R. §§ 413.9(a), (c)(3); *see also* 42 C.F.R. § 413.9(b)(2).

Home health agencies, such as plaintiffs here, not only provide services to Medicare patients but also to patients who are covered by private insurance or by Medicaid. (Tr. at 639).[3] Medicaid reimburses on an hourly basis for home health aide visits to blind, aged, and disabled individuals who cannot afford the costs of necessary medical care. 42 U.S.C. §§ 1396–1396v. (*See* Tr. at 439, 5373).

In an effort to deal with the appropriate distribution of costs among Medicare, Medicaid, and other patients, 42 U.S.C. § 1395x(v)(1)(A) provides that the regulations promulgated by the Secretary:

shall take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [Medicare].

Thus, the home health agency's total allowable costs are to be apportioned between Medicare and non-Medicare patients. 42 C.F.R. §§ 413.9(b)(1), 413.53. Section 413.9(c)(3) of the Code of Federal Regulations provides that "[t]he determination of reasonable cost of services must be based on cost related to the care of Medicare beneficiaries." 42 C.F.R. § 413.9(c)(3).

In calculating reimbursement, the regulations use a "cost per visit" methodology. A "visit" is defined in the regulations as "an episode of personal contact with the beneficiary by staff of the [home health agency] . . . for the purpose of providing a covered service." 42 C.F.R § 409.48(c) (1995). A visit is defined as beginning with the delivery of "covered services" and ending at the conclusion of the delivery of "covered services." 42 C.F.R. § 409.48(c)(4) (1995). *See generally* Home Health Agency Manual §§ 218.1, 218.2; (Tr. at 5653).

Section 413.53(a)(3) of 42 C.F.R. sets forth the procedure for determining "cost per visit":

The total allowable cost of all visits for each type of service is divided by the total number of visits for that type of service. Next, for each type of service, the number of Medicare covered visits is multiplied by the average cost per visit just completed.

42 C.F.R. § 413.53(a)(3). Thus, there is a three-step process: (1) first, total costs are determined; (2) nonallowable costs, such as luxury items, are then subtracted from the total cost figure; and (3) the resulting allowable costs are apportioned between Medicare payees and all others. (Tr. at 631–32, 1256–57); 42 C.F.R. § 413.50(a). Section 413.53(a)(3) of the Code of Federal Regulations, entitled "Determination of

---

**3.** Citations to "Tr. at" refer to pages in the transcript of the hearing before the PRRB on February 18, and February 19, 1999.

Cost of Services to Beneficiaries," was promulgated to set forth the methods to be used to apportion costs. 45 Fed.Reg. 57, 126–27 (1980).

In defining the services that are to be included, 42 C.F.R. § 409.40(d) specifically defines them as "part-time or intermittent services of a home health aide." This concept is further explained by the Secretary in the Home Health Agency Manual (the "Manual") which provides as follows:

> Part-time or Intermittent Home Health Aide and Skilled Nursing Services.— Where a patient qualifies for coverage of home health services, Medicare covers either part-time or intermittent home health aide services and skilled nursing services.

Home Health Agency Manual § 206.7; (Tr. at 5586). "Part-time" is defined in the Manual as up to "28 hours per week" of home health aide and skilled nursing services "for less than 8 hours per day" or up to "35 hours per week" for less than "8 hours per day subject to review by fiscal intermediaries on a case by case basis" with justifying documentation. Home Health Agency Manual § 206.7. "Intermittent" is defined in the Manual as up to 28 hours per week or 35 hours with justification of these same combined services but "provided on less than daily basis." *Id.* Full-time care of 8 hours per day, seven days a week, would be considered intermittent if provided for a temporary period of up to 21 days. *Id.*

E. *The Audit*

As early as 1991, VNAB was notified that there were problems with its cost reporting practices. By letter dated August 21, 1991, UGS advised VNAB that its average cost per home health aide visit as reported in the 1989 cost report was unreasonably high. (Tr. at 5389–90). Specifically, the UGS noted that the average time of 9 hours claimed by VNAB for a home health aide visit exceeded the 8 hour time frame set forth in the Home Health Agency Manual, Section 206.7. (*Id.* at 5389).

On March 11, 1992, an Audit and Reimbursement Advisory Meeting was held, attended by representatives of both UGS and VNAB. (*Id.* at 5853–57, 5911–15). One of the issues addressed at the meeting was whether providers were properly reporting home health aide visits. (Tr. at 5854). At the time, it was explicitly noted that Medicaid and Medicare did not provide the same coverage. (*Id.*)

UGS formally complained about VNAB's cost reporting practices for 1990. By letter dated March 24, 1992, UGS reported that "[t]he long length of the non-Medicare visits is distorting the cost per discipline" and resulting in unnecessary cost to the Medicare Program. (*Id.* at 5391). A similar letter was sent on June 28, 1993, noting the reported length of non-Medicare visits for the cost reporting year 1991. (*Id.*).

By letter dated September 29, 1993, UGS reported that it was reconsidering VNAB's cost reports for the years 1988, 1989, and 1990, and that it was seeking clarification from HCFA regarding the definition of "Medicare type" visit. (Tr. at 1535–36). The concern was that there had been a significant increase in the cost of services provided to individuals covered by Medicare as a result of the length of non-Medicare home health aide visits used to calculate costs. (*Id.*)

In an "Identical Letter to All Intermediaries," dated January 31, 1994, the Acting Chief of the Financial Management Branch, Division of Medicare, HCFA, Region V, addressed the fact that, in calculating their average cost per visit, some home health agencies were including homemaker services, such as cooking, shopping, cleaning, and laundry, which are excluded from

coverage under Medicare. *Id.* at 5228–29, 5432–33, 5859, 5971. The letter cited 42 C.F.R. § 413.53(a)(3) and noted .that in apportioning costs between non-Medicare and Medicare recipients, non-Medicare visits should be included in the calculation of the average cost per visit only to the extent that those visits and those costs are of the same type as those that are covered and allowed under Medicare. *Id.* Fiscal intermediaries were advised to examine home health agency cost reports for the inclusion of homemaker services. *Id.* at 5229.

The HCFA also revised its cost reporting form—the Health Agency Cost Report (Form HCFA 1728–94)—effective for cost reporting periods ending on or after December 31, 1994, and instructions for completing this new form were set forth in the Provider Reimbursement Manual ("PRM"), Part 2, Chapter 32. (Tr. at 1322–35). The instructions make clear that "[a] visit" is "for the purpose of providing Medicare-type services" as defined in the Home Health Agency Manual §§ 205, 206, in HCFA Pub. 13–3, §§ 3118 and 3119, and 42 C.F.R. § 409.40. These include the definitions of "part-time" or "intermittent" and make it clear that in calculating the length of a "visit," the time included should be limited to that time used to deliver Medicare-type home health services only. *See* Provider Reimbursement Manual § 3205. (Tr. at 1329).

On June 30, 1994, both VNAB and VNAHCS were sent letters indicating that UGS was reopening their cost reports for 1989, 1990 and 1991 regarding a problem with the length of the average visit reported. (Tr. at 1534, 1656, 1727).

Thereafter, on October 10, 1994, UGS issued its newsletter, "Medicare Memo," to all providers, which contained an article entitled "Non–Medicare Extended Visits." *Id.* at 1705, 5225, 5429, 5861. The article

addressed the regulations at 42 C.F.R. § 413.53(a)(3) and the methodology used to apportion costs. The article noted that UGS's review of costs reports had revealed that some home health agencies were improperly classifying non-Medicare costs and visits in their reports. *Id.* The article further stated that non-Medicare visits were to be included in the cost calculation only to the extent that the visit was of the same type as allowed under Medicare. *Id.* at 1705. Providers were reminded that unless visits satisfied the definition of home health aide services as defined in Section 206.2 of the Manual, they should not be considered in calculating average cost per home health aide visit. *Id.* The article further noted that HCFA had issued a directive to all fiscal intermediaries to review cost reports for such unallowable reporting practices. *Id.*

The subsequent April 3, 1995 "Medicare Memo" newsletter also included an article discussing the length of Medicare home health aide visits. *Id.* at 1707–08.. In that article, it was explained that there is no set length for a Medicare visit; it ·should be ·based on the need of the individual. (Tr. at 1708). However, the article stated that Medicare would reimburse only for those services "which meet the coverage criteria and are *part-time or intermittent*," as defined in Section 206.7 of the Manual. *Id.* (emphasis in original). In discussing the fact that certain patients who receive intermittent health services may also require custodial home care, the article expressed UGS's view that "[t]hese types of extended home health aide visits are not Medicare-like and should not be included." *Id.*

VNAB received interim Medicare payments of approximately $7,389,116.00 as reimbursement for 6,900 Medicare claims for home health aide services rendered between January 1, 1995 and December

31, 1995. Agisim Decl. ¶ 5.[4] Approximately $7,281,360.00 was received in interim payments by VNAB for the cost reporting year of January 1, 1996 through December 31, 1996 based on 5,800 Medicare claims for home health aid services. *Id.* ¶ 13. For the same time periods, VNAHCS received interim Medicare payments of approximately $7,917,300.00 based on 11,700 Medicare claims for home health aide services in 1995, and $7,563,300.00 based on 10,300 claims for such services in 1996. *Id.* ¶¶ 22, 29. Certified cost reports were received from both VNAB and VNAHCS for each of these cost reporting years, signed under penalty of perjury by Bernice Rosner, Executive Director, on behalf of VNAB, and by Calvin Spring, Chief Financial Officer and Vice President, on behalf of VNAHCS. Agisim Decl., Exs. A, C; Pls.' 56.1 Stmnt ¶¶ 85, 88.

In June 1995, UGS conducted a comprehensive review of plaintiffs' home health aide visits, requesting from both VNAB and VNAHCS lists of Medicaid[5] patients receiving home health aide services for the period of 1989–1993. (Tr. at 296–97, 299, 379–80, 657, 771). A random sampling of 79 patients from VNAB and 61 patients from VNAHCS were chosen and their files were reviewed to determine how many "Medicare-like" hours of service were performed. *Id.* at 301, 503.

During the course of the audit of plaintiffs' cost reports for 1995, UGS determined that VNAB's visits to non-Medicare patients ran on average twice as long as their visits to Medicare patients and that VNAHCS's visits were 1.5 times longer for

non-Medicare patients as compared with their Medicare patients. Tr. at 277–79. UGS calculated that on average, VNAB was claiming 3.99 hours per visit to Medicare patients, 8.15 hours per visit to Medicaid patients, and 4.27 hours per visit for other patients. *Id.* at 5303. Although VNAB's 1995 Medicaid reimbursement rate was $15.95 per hour, VNAB sought reimbursement for home health aide services from Medicare at the rate of $95.79 per visit. *Id.* at 5297, 5973. For the same period, UGS calculated that VNAHCS was claiming 4.08 hours as the average length per visit for Medicare patients, 7.12 hours for Medicaid patients, and 4.64 hours for others. *Id.* at 5122. VNAHCS's claimed rate of reimbursement from Medicare was $80.96 per visit, and their rate for Medicaid visits was $17.73 per hour. *Id.* at 5122, 5973.

UGS concluded that, in calculating the costs per visit, plaintiffs had included services not covered by Medicare and had improperly shifted these costs to the Medicare program. Based on its calculations, UGS determined that after the excess hours for non-reimbursable services were removed, the readjusted number of average hours for Medicare approved services should have been 4.375 hours. Thus, when the 3.525 non-Medicare type hours were removed from the calculation, there was a savings of $779,500.00 to the Medicare program with respect to VNAB. Agisim Decl. ¶ 9; Tr. at 1261.

Although a different methodology was used to calculate the amount of overpay-

**4.** Citations to "Agisim Decl." refer to Elliot Agisim's Declaration in Support of Defendants' and Defendant–Counter–Claimant's Motion for Summary Judgment, dated August 23, 2001.

**5.** Both party submissions and transcripts show that a list of Medicaid (not Medicare) patients was requested to determine how

many "Medicare-like" hours of service were performed for these patients. Not only were visits to Medicaid patients reimbursed on a per hour basis, but Medicaid paid for homemaker and companion services that were not covered by Medicare. (*See* PRRB Decision of March 27, 2000 at 11).

ment to VNAHCS, UGS concluded that the appropriate number of Medicare approved hours per visit was 4.63, resulting in an overpayment by Medicare to VNAHCS of $69,945.00 for 1995. (Agisim Decl. ¶ 25). Similar problems were noted in the 1996 cost reports for both VNAB and VNAHCS, resulting in overpayments of $610,000.00 to VNAB and $220,000.00 in overpayments to VNAHCS. (*Id.* ¶¶ 16, 32).

## F. *The PRRB's Determination*

NPRs were issued to both VNAB and VNAHCS for the year 1995 and the Providers appealed to the PRRB. Pls.' 56.1 Stmnt ¶¶ 102, 107, 112; Tr. at 1259–1313, 1770–1803, 5421–25, 6030–34. On February 18, 1999, the PRRB held a hearing at which various officials and consultants to the Providers testified, along with managers and employees of UGS. *See* Def. Mem. at 32–36.[6]

Based on the hearing, the PRRB issued a decision on September 17, 1999, in which the Board agreed with UGS, finding that the Providers had incorrectly included non-reimbursable costs and hours for non-Medicare visits which inflated the Providers' cost per visit, resulting in a shifting of costs to the Medicare program. (Tr. at 49). However, the PRRB disagreed with the approach taken by UGS to adjust costs, finding no link between 42 C.F.R. § 413.53 and the eligibility and coverage regulation at 42 C.F.R. § 409.42. (PRRB Decision of Sept. 17, 1999 at 49). The PRRB also disagreed with the methodology used by UGS to recalculate costs, concluding instead that a cost per hour methodology would be more accurate. (*Id.* at 49–50).

Plaintiffs sought reconsideration from the PRRB, which reissued its decision on March 27, 2000, reiterating its prior finding that plaintiffs had improperly computed costs but clarifying how the overpayments should be calculated. In its second decision, the PRRB found that neither the UGS's methodology nor the cost per visit methodology would produce the most accurate estimate. Instead, the PRRB stated: "a better common denominator would be the utilization of a cost per hour methodology given the significant amount of non-Medicare aide costs factored into the cost per visit computation." (PRRB Decision of March 27, 2000 at 22; Tr. at 22). The PRRB then ordered that the reimbursements to plaintiffs be recomputed using hours instead of numbers of visits. (*Id.*)

Plaintiffs' request for review of the March 27, 2000 decision of the PRRB was denied by the HCFA Administrator on May 24, 2000,[7] and, as a consequence, the decision became the final decision of the Secretary. (Tr. at 1).

In accordance with the decision, UGS recalculated the amounts owed and determined that VNAB had been overpaid by $201,903.00 and VNAHCS had been overpaid by $42,536.00. (Agisim Decl. ¶¶ 12, 28). These amounts were recouped from interim Medicare payments made to plaintiffs.

While their request for reconsideration was pending before the PRRB, plaintiffs filed this action on November 19, 1999, challenging the PRRB's decision. The Amended Complaint was thereafter filed on May 19, 2000, following the PRRB's decision of March 27, 2000.

---

6. Citations to "Defs.' Mem." refer to Defendants' and Defendant–Counter–Claimant's Memorandum of Law in Support of Their Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, dated August 23, 2001.

7. Plaintiffs' request to the HCFA Administrator for review of the first PRRB decision had been denied on November 17, 1999.

## II. Standards of Review

### A. *Summary Judgment*

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, *see Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 754 (2d Cir.1976); *Gibralter v. City of New York*, 612 F.Supp. 125, 133–34 (E.D.N.Y.1985), the court should not grant summary judgment unless it is clear that all of the elements have been satisfied. *See Auletta v. Tully*, 576 F.Supp. 191, 194 (N.D.N.Y.1983), *aff'd*, 732 F.2d 142 (2d Cir.1984). In addition, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

Once the moving party discharges its burden of proof under Fed.R.Civ.P. 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.' " ·*Phillips v. Kidder, Peabody & Co.*, 782 F.Supp. 854, 858 (S.D.N.Y.1991) (quoting Fed.R.Civ.P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct. 2505. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247–48, 106 S.Ct. 2505 (emphasis added).

### B. *The Secretary's Decision and Findings of Fact*

▮ A separate standard of review governs a federal court's review of the Secretary's final decision in a Medicare reimbursement dispute. Under the Medicare statute, judicial review of the Secretary's action is to be conducted in accordance with the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* *See* 42 U.S.C. § 1395oo(f)(1); *Huntington Hosp. v. Shalala*, 130 F.Supp.2d 376, 382 (E.D.N.Y.2001); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 510, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (holding that the APA standard is "incorporated by" the judicial review section of the Social Security Act). Under this standard, the Secretary's determination of what constitutes "reasonable costs" "may be reversed only if it is arbitrary, capricious, not supported by substantial evidence or otherwise not in accordance with law." *Neiman*, 722 F.Supp. at 957 (citing cases). Moreover, in reviewing the Secretary's decision here, the Court's review is limited to the agency's decision and the record on which it was based. 5 U.S.C. § 706; *Id.* Only when the agency's fact finding procedures are inadequate may the court engage in *de novo* review of factual issues. *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

## III. Discussion

### A. *Validity of the 1995 PRM*

The Providers' principal argument is that the Report incorrectly concluded that

PRM § 3205 was a valid rule change with which they were obligated to comply. This argument proceeds in several steps. First, the Providers contend that § 3205 was invalid because it is a legislative rule that was not enacted pursuant to the notice and comment procedures mandated by the APA. Second, they assert that even if § 3205 was an interpretive rule, the Secretary was still required to enact that rule in accordance with the APA requirements because it represented a substantial change from the Secretary's previous interpretation of the cost-reporting regulations. Third, the Providers argue that even if notice and comment were not required, the Report erred in granting substantial deference to the Secretary's interpretation of the regulations. Finally, the Providers argue that irrespective of the level of deference owed by this court to the Secretary's interpretation, § 3205 is nonetheless invalid because it is fundamentally incompatible with the clear and unambiguous language of 42 C.F.R. § 413.53, the very regulation the provision purports to interpret. (Pl. Obj.21–22). For the reasons set forth below, this court adopts Judge Pollak's conclusion that the 1995 PRM was a valid interpretation of the cost-reporting regulations with which the Providers were obligated to comply.

1. PRM § 3205 Is an Interpretive Rule.

▆▆▆ The Providers begin their substantive criticism of the Report by arguing that the Report should have held that the 1995 rule was legislative in character, and therefore invalid because the Secretary issued it without complying with the notice and comment provisions of the APA. (Pl.

Obj.15, 21). The APA requires that when an agency engages in rulemaking, it must provide public notice of the proposed rule with an opportunity to comment. 5 U.S.C. §§ 553(b), (c). *See Sweet v. Sheahan*, 235 F.3d 80, 90 (2d Cir.2000). However, when a proposed rule is merely interpretive, the APA exempts such rulemaking from its notice and comment provisions. *See Sweet*, 235 F.3d at 90 (citing 5 U.S.C. § 553(b)(3)(A)); *Warder v. Shalala*, 149 F.3d 73, 79 (1st Cir.1998) (citing 5 U.S.C. § 553(b)(3)(B)). The APA's exemption for interpretive rules is expressly incorporated into the Medicare Act. *Warder*, 149 F.3d at 79 (citing 42 U.S.C. § 1395 hh(b)(2)(C)(1994)). Whether an administrative ruling is legislative or interpretive is an issue of law for the court. *Id.*

While the terms "legislative" and "interpretive" are not explicitly defined in the APA, the Second Circuit has stated that "legislative [8] rules are those that 'create new law, rights or duties, in what amounts to a legislative act.'" *Sweet*, 235 F.3d at 91 (quoting *White v. Shalala*, 7 F.3d 296, 303 (2d Cir.1993)). By contrast, interpretive rules "'do not create rights, but merely "clarify an existing statute or regulation.'"" *Id.* (quoting *United States v. Yuzary*, 55 F.3d 47, 51 (2d Cir.1995) (quoting *White*, 7 F.3d at 303)). Legislative rules and interpretive rules "differ in important ways," *Sweet*, 235 F.3d at 91, but the line between the two is "far from clear." *Warder*, 149 F.3d at 79.

The Providers argue that PRM § 3205 is a legislative rule because it "created a substantive change to the way average costs for home health services are to be calculated by changing the average 'allow-

---

8. Courts have criticized the "substantive/interpretive" distinction as "confusing," *see Metropolitan School Dist. v. Davila*, 969 F.2d 485, 488 (7th Cir.1992), and the Second Circuit has agreed that even though the term

"legislative" does not appear in the APA, the differences should be discussed in terms of "legislative" and "interpretive" rules. *See Sweet v. Sheahan*, 235 F.3d at 91 n. 7.

able' cost concept to an average Medicare 'covered' cost concept," thus creating new duties for institutions like the Providers. (Pl.Obj.5). The new rule had this substantial effect, the Providers argue, because it created a link for the first time between the coverage and cost-reporting rules. (Pl.Obj.13). The Secretary counters that PRM § 3205 did not create new duties for the Providers at all, but rather served as a reminder that other obligations governing Medicare reimbursement claims also applied to submissions made pursuant to the cost-per-visit methodology prescribed in 42 C.F.R. § 413.53. (Def.Resp.5).

The Secretary has the better of this argument. A review of the regulations governing institutions providing home health aide services to Medicare beneficiaries demonstrates that there was no high wall of separation between the coverage and cost reporting rules prior to 1995, as the Providers contend. On the contrary, it is clear that there was substantial overlap between the cost-reporting and coverage rules from 1980 on, and therefore that the Secretary did not create new duties for the Providers in restating that Medicare providers were obligated to comply with applicable coverage rules in submitting their cost reports.

According to the Providers, 42 C.F.R. § 413.53(a)(3) is susceptible only of the following, unambiguous interpretation: "first costs for providing home health aide services are identified;" second, "unallowable costs" are subtracted; " and third, the total number of home health aide visits provided to all patients... are divided into the total allowable costs." (Pl.Obj.19). No party to this litigation disputes that the methodology should be applied in this manner. However, the Providers and defendants disagree significantly about precisely what costs are allowable and may be reported, and which are unallowable and

must be excluded. In order for the Providers to prevail in arguing that PRM § 3205 did not merely "clarify an existing statute or regulation" Sweet, 235 F.3d at 91, they must show that the line drawn between allowable and unallowable costs in the cost-reporting regulations is clear and unambiguous, and that the instructions contained in PRM § 3205 substantially depart from that delineation. This feat is far beyond the Providers' powers.

There is no single, authoritative definition of the term "allowable costs" in the Medicare regulations. Rather, several regulatory and interpretive provisions define certain costs as unallowable. The Providers draw their definition of allowable costs from these provisions, concluding that "[c]osts are 'allowable' so long as the costs are related to patient care, are reasonable and necessary, prudent, and are not luxury items, fund-raising, solicitation, or for personal use." (Pl. Obj. 13, citing to 42 C.F.R. §§ 413.53(a)(3), 413.5 and 413.9, and PRM § 2102 et seq.) Other than these exclusions, the Providers argue, all costs incurred in the provision of services of the type provided to Medicare beneficiaries are allowable. (Pl.Obj.13). By extension, their argument is that any interpretation that attempts to add any other cost categories to their list of non-allowable costs directly contravenes the governing regulations.

A careful reading of the regulations cited by the Providers casts serious doubt on the Providers' contention that their list of unallowable cost categories is complete and exclusive. The same provisions cited by the Providers include clauses mysteriously absent from the above definition of allowable costs. 42 C.F.R. § 413.9(b)(3), for example, dictates that "[i]f the provider's operating costs include amounts *specifically not reimbursable under the program*... such amounts will

not be allowable." It is noteworthy, to say the least, that this clause, which directly supports the Secretary's interpretation of the cost reporting rules, appears between two other clauses included in the Providers' definition of allowable costs.[9] The Providers also ignore numerous provisions of the regulations which instruct that the cost reimbursement regulations are to be administered and interpreted such that "the costs with respect to individuals covered by [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program." 42 C.F.R. § 413.9(b)(1). *See also,* 42 C.F.R. § 413.5(a), 42 C.F.R. § 413.5(b)(3), 42 C.F.R. § 413.53(a), PRM § 2102.1 (Reasonable Costs), PRM § 2102.2 (Costs Related to Patient Care, noting that "[a]llowability of costs is subject to the regulations prescribing the treatment of specific items under the Medicare program").

The incorporation by reference of these, and other provisions, in PRM § 3205, therefore signals that the Secretary's 1995 interpretation of the cost-reporting rules did not impose "new duties" on the Providers or other institutions, but simply restated that the Providers were required to adhere to limitations contained in other sections of the Medicare regulations in preparing their cost reports. As a result, the Report correctly found that PRM § 3205 was an interpretive rule, rather than a legislative rule.

### 2. Conflict with Prior Definitive Interpretation

The Providers also contend that the Report erred in rejecting the Providers' argument that PRM § 3205 was invalid because it substantively changed the Secretary's previous interpretation of the cost-reporting regulations without notice and comment. (Pl.Obj.17). The Second Circuit has not had an opportunity to decide whether agencies must follow notice and comment procedures in order to revise existing official interpretations of their own regulations. However, this court finds no evidence that the PRM provision was at odds with either a prior written interpretation of the cost-reporting regulations or any pattern of practice sufficiently long-standing to establish that the Secretary had arrived at a definitive interpretation of these rules prior to issuing PRM § 3205. As such, the conclusion of the Report on this point is adopted by this court.

■ It is settled, at least in this circuit, that "an interpretive rule changing an agency's interpretation of a *statute* is not magically transformed into a legislative rule... it remains interpretive even if the rule embodies the Secretary's changed interpretation of the *statute.*" *White v. Shalala,* 7 F.3d 296, 304 (2d Cir.1993) (emphasis added). However, the legal standing of an agency's changed interpretation of its own *regulation* remains the subject of some debate. In arguing that an agency may not change its interpretation of an

---

9. 42 C.F.R. § 413.9(b)(3) reads, in relevant part: "The determination of reasonable cost of services must be based on cost related to the care of Medicare beneficiaries. Reasonable cost includes all necessary and proper expenses incurred in furnishing services, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs. However, if the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services (that is, those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable."

existing regulation without providing opportunity for notice and comment under the APA, the Providers place heavy reliance on a recent decision of the District Court for the District of Columbia, *Mercy Med. Skilled Nursing Facility v. Thompson*, C.A. 9902765(TPJ) (D.D.C. May 14, 2004). There, following D.C. Circuit precedent, the court held that an agency provision was invalid because it had not been promulgated in accordance with the APA even though it was merely an interpretive rule because "when an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Id.* at 5 (quoting *Alaska Professional Hunters Assoc. Inc. v. FAA*, 177 F.3d 1030 (D.C.Cir.1999).) *See also Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579, 586 (D.C.Cir.1997); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir.2001). The First and Ninth Circuits have disagreed, reasoning that in order for notice and comment to be necessary, "the [later] rule would have to be inconsistent with another rule having the force of law, not just any agency interpretation." *Warder v. Shalala*, 149 F.3d 73, 81 (1st Cir.1998) (quoting *Chief Probation Officers v. Shalala*, 118 F.3d 1327, 1337 (9th Cir.1997).) *See also Erringer v. Thompson*, 371 F.3d 625, 632 (9th Cir. 2004).

The Second Circuit has never squarely decided this issue, though it has hinted on at least one occasion that it would resolve the question in favor of requiring administrative agencies to employ notice and comment in altering established interpretations of applicable regulations. *See State of New York v. Lyng*, 829 F.2d 346, 353–54 (2d Cir.1987) (noting in passing that "since there was no prior interpretation of the [regulations], the Secretary's interpretation ... was an interpretive rule not subject to the notice and comment requirements of [the APA].").

Even assuming *arguendo* that an agency must follow APA procedures when it wants to change its interpretation of a regulation, the Providers' assertion that the Report erred in concluding that PRM § 3205 was a validly enacted provision is uncompelling. Put simply, PRM § 3205 does not represent a change from a prior "definitive interpretation" of the cost-reporting regulations because PRM § 3205 was the Secretary's initial interpretation of those rules. Nowhere in their voluminous submissions to the court or objections to the Report are the Providers able to identify an earlier, authoritative interpretation of the cost-reporting regulations that conflicts with the 1995 PRM provision. To the contrary, the affidavits submitted by the Providers to the PRRB and cited in their objections to the Report on this point concede that "*the first time* HCFA enunciated a policy on length of visit was in the cost report instructions for cost report periods ending on or after December 31, 1994 ... These instructions appear in [PRM] § 3205." Raffa Decl. Exhibit O, Bloss Aff. ¶ 26. (emphasis added). *See also* Raffa Decl. Exhibit P, Blumengold Aff. ¶ 29. (Pl.Obj.17–18).

Undeterred by their failure to identify an affirmative statement outlining an earlier definitive interpretation of the cost-reporting regulations, the Providers also assert, again relying on *Mercy Medical*, that the Secretary's acceptance of cost reports submitted "without any modifications to account for any disparities" between the length of visits provided for Medicare and non-Medicare beneficiaries prior to 1995 indicates that the Secretary had adopted an earlier interpretation of the cost-reporting regulations that was at odds with PRM § 3205. Raffa Decl. Exhibit O, Bloss Aff:

¶ 24. They also contend that HCFA was made aware of these disparities and told the Providers to "ignore the situation because this was they way the Cost Report was created." Raffa Decl. Exhibit O, Bloss Aff. ¶ 22. From this, the Providers argue that the Secretary had a long established practice, dating back at least to 1982, of accepting disparities between the length of visits to Medicare and non-Medicare patients that was invalidly reversed by PRM § 3205 in 1995, and that this long established practice constitutes a definitive interpretation from which the Secretary may not unilaterally depart. (Pl. Obj. 17–18, citing *Mercy Medical* at (7)).

This argument is without merit. Even if this court were to accept that a pattern of practice, without more, is sufficient to establish that an agency has adopted a definitive interpretation of a regulation, the Providers' argument would remain unavailing because the pattern of practice ascribed to the Secretary by the Providers is not inconsistent with the 1995 interpretive rule. The "definitive interpretation" identified by the Providers—of accepting some disparities in length of visit—is, as the Providers correctly note, a natural outgrowth of the cost per visit by type of service methodology defined in 42 C.F.R. § 413.53. Critically, however, the Providers offer no evidence that the Secretary's "definitive interpretation" encompassed the acceptance of disparities of the type or magnitude discovered by UGS in its audits of the Providers' cost reports. Rather, the Providers' discussions with HCFA officials in the early 1980s appear to have addressed disparities well within the parameters laid out in PRM § 3205. *See* Raffa Decl., Exhibit O Bloss Aff. ¶¶ 19–24; Exhibit P, Blumengold Aff. ¶¶ 23–26.[10] Thus the question addressed by § 3205—whether there are any costs of services rendered to non-Medicare beneficiaries which may not be reported as a basis for claiming Medicare reimbursement—was one that had not been addressed by any reasonable construction of the "definitive interpretation" imputed to the Secretary by the Providers. In short, § 3205 restated the "definitive interpretation" that *some* disparities in length of service are tolerable, but also clarified that not *all* such disparities are acceptable, and outlined in some detail which disparity-producing activities were unacceptable and why.

Given the absence of conflict between § 3205 and the interpretation attributed to the Secretary by the Providers, as well as the further evidence that the Secretary actively attempted throughout the period following the adoption of the cost-per-visit by type of service methodology to prevent excessive cost-shifting to the Medicare program, this court concludes that PRM § 3205 did not constitute a substantial change to any previous interpretation of a regulation. As such, the Secretary was not required to promulgate § 3205 in accordance with the notice and comment provisions of the APA. The Providers' contention that the Report erred in its analysis of this point is therefore rejected.

### 3. Deference

██ The Providers next argue that the Report committed a substantial error of

---

10. The example provided in these declarations was the following:
"Two visits performed by Home Health Aides. One visit was two hours in duration and provided to a Medicare covered patient. One visit was four hours in duration and provided to a patient covered by Medicaid. The cost incurred by the provider for these services was $7 per hour.... Medicare's Share [under the cost-per visit method] = $ 21.00. If the [only the costs incurred in caring for the Medicare beneficiary] had been utilized, Medicare's share would have been $ 14.00."

administrative law in deciding that the Secretary's interpretation of 42 C.F.R. § 413.53 was entitled to "substantial deference" because "interpretations such as those ... contained in policy statements, agency manuals, and enforcement guides" are not entitled to the high degree of deference reserved for duly promulgated agency interpretations of Congressional enactments. *Christensen v. Harris Cty.,* 529 U.S. 576, 587–88, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). According to the Providers, the Report therefore applied the wrong standard of review in limiting its review of PRM § 3205 to whether that interpretation was "plainly erroneous or inconsistent with" the meaning of 42 C.F.R § 415.53. (Pl.Obj.15–17).

The Providers' reading of *Christensen* is far too broad. In *Christensen,* the Supreme Court limited its holding that unpromulgated interpretations are not entitled to deference to agency interpretations of *statutes,* and expressly declined to disturb the standing rule that "an agency interpretation of its own *regulation* is entitled to deference." *Id* at 588, 120 S.Ct. 1655 (citing *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)) (emphasis added). *See also Taylor v. Vt. Dept. of Education,* 313 F.3d 768, 780 n. 7 (2002). Moreover, it is well settled that courts should extend an unusual degree of respect to the Secretary's interpretation of the Medicare statute and regulations because of the scope and complexity of the program. *See, e.g., Wisconsin Dept. of Health and Family Services v. Blumer,* 534 U.S. 473, 497, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002) (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) and *Schweiker v. Gray Panthers,* 453 U.S. 34, 43–44, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981)); *Community Health Center v. Wilson–Coker,* 311 F.3d 132, 138 (2d Cir.2002).

■ In light of this guidance, the Report properly limited its review of the Secretary's interpretation to whether that interpretation was "irrational or contradicted by other rules." *Keefe v. Shalala,* 71 F.3d 1060, 1065. As discussed in detail *supra* at Part III.A.1, there is ample evidence that the cost-reporting regulations have long incorporated elements of the coverage rules, and that the everything-goes interpretation of the cost-reporting rules favored by the Providers runs sharply counter to the language of the governing regulations. The Report therefore extended the correct degree of deference to the Secretary's interpretation of the cost-reporting regulations in § 3205, and correctly determined that the Secretary's interpretation was not irrational and should be upheld.

### 4. Contrary to Unambiguous Statutory Command

■ Finally, the Providers argue that, irrespective of the level of deference due to the Secretary's interpretation of the cost-reporting regulations, § 3205 was invalid because it contradicts the clear and unambiguous language of the regulation it purports to interpret. (Pl.Obj.18–19). As indicated *supra* in Parts III. A. 1 and A. 3, this court disagrees with the Providers' contention that § 3205 is at odds with the plain language of 42 C.F.R. § 413.53. This court therefore adopts the Report's conclusion that the Secretary's interpretation comports with the regulation it is intended to clarify, and was validly issued.

### B. *The Secretary's Remedy*

■ The Report also recommends that this court endorse the cost-per-hour method adopted by the PRRB, and subsequently the Secretary, in recalculating the sum that the Providers were owed for services rendered to Medicare beneficiaries for

1995 and 1996. (Report at 35–36.) The Providers object strenuously to the application of this methodology, arguing that the PRRB recommendation represents yet another legislative rule change, unlawfully enacted without resort to notice and comment procedures. (Pl. Obj. at 11, 15, 22). The only proper methodology for calculating reimbursement absent the promulgation of a superceding regulation, irrespective of the accuracy of the cost reports provided by the participating institution, the Providers appear to argue, is the cost per visit by type of service methodology laid out in 42 C.F.R. 413.53. (Pl.Obj.22–23).

The Providers' arguments on this point are unavailing. For starters, their characterization of the PRRB's one-time utilization of a per-hour methodology to recalculate the amount of money due to the Providers for 1995 and 1996 as a "new regulation" is simply misleading. (Pl. Obj.11). Nothing in the record suggests that the Secretary is attempting to substitute the cost-per-visit methodology described in 42 C.F.R. § 413.53(a)(3) for another, either permanently or on an *ad hoc* basis. Rather, the issue is whether the Secretary may resort to an alternate reimbursement methodology *as a remedial measure* where the initial submission of flawed cost reports has made an accurate calculation of the reimbursement due to that provider difficult or impossible.

 This court answers that question, as did the Report, in the affirmative. While the regulations require home health agencies ("HHAs") to employ the cost-per visit by type of service method for initial cost reporting, the regulations are silent as to how the Secretary should arrive at an accurate cost report figure where the cost reports submitted by the HHAs are demonstrably flawed. Where "an agency regulation is silent or ambiguous with re-

spect to the specific point at issue, [courts] must defer to the agency's interpretation as long as it is reasonable." *Tenet Health-Systems Corp. v. Thompson*, 254 F.3d 238, 248 (D.C.Cir.2001). It is likewise clear that the Secretary properly may resolve reimbursement questions not addressed by specific provisions of the regulations by referring them to the PRRB for adjudication. *Id.See also Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 96, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Finally, courts reviewing the Secretary's findings of fact are required to defer to these findings if they are supported by substantial evidence. *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984).

In conjunction, these principles require that this court affirm the Secretary's decision to apply a cost-per-hour methodology to recalculate the reimbursement actually due to the Providers for home health aide services rendered in 1995 and 1996. The PRRB conducted an extensive investigation of the dispute between the Providers and UGS, during which it concluded that the cost-per-visit method would not produce "the most accurate or equitable Medicare reimbursement." (PRRB Reissued Decision at 17). Based on this factual finding, the PRRB then considered other available methodologies, concluding that "a better common denominator would be the utilization of a cost per hour method." *Id.* The plaintiffs have presented no evidence suggesting that the PRRB's decision to apply a cost per hour method as a remedial measure in this case resulted in an inaccurate estimate of the reimbursement due to the Providers. They also decline to argue that the average cost figures submitted by the Providers could have been modified such that the cost per visit methodology could have been reapplied in a manner that would satisfy the concerns raised by the PRRB and the UGS. Nor

does anything in the record before the court suggest that the findings of fact adopted by the Secretary in this regard were not supported by substantial evidence. To the contrary, this court concludes that the PRRB's findings were adequately supported by the record before it, and that the Secretary acted reasonably in the face of regulatory silence on the issue of how to estimate home health aide reimbursement levels after concluding that the Providers had significantly scrambled the true costs of services rendered to Medicare beneficiaries by preparing and submitting cost reports that were burdened with costs associated with extended non-Medicare visits. This court therefore finds that the PRRB acted within its delegated power to "affirm, modify or reverse a determination of an intermediary with respect to a cost report," (42 C.F.R. § 405.1869) and affirms the Secretary's final decision with respect to the Providers' reimbursement levels for 1995 and 1996.

## C. Plaintiffs' Declaratory Relief Motion

The Providers have moved for declaratory relief to preclude the Secretary and UGS from applying the interpretation of the cost-reporting regulations embodied in PRM § 3205 for years subsequent to 1995 and 1996. (Pl.Obj.24). Because the court has now found that the Secretary was entitled to apply the interpretation that he did, the Providers' corollary motion for a declaratory judgment that he was not entitled to apply that same interpretation in subsequent years is denied as moot.

## D. Defendants' Cross–Claims

The Providers also objected to the Report's recommendation that this court grant summary judgment on the defendants' cross-claims under the False Claims Act and on several common-law causes of action. For the reasons discussed below, this court agrees that the defendants are entitled to summary judgment on these claims.

### 1. False Claims Act

Judge Pollak concluded that the defendants were entitled to summary judgment on the False Claims Act ("FCA") cross-claims, finding that the Providers had (1) presented claims for payment to an agent of the United States; (2) that the claims were false or fraudulent; (3) that the Providers knew the claims were false or fraudulent; and (4) that the United States suffered damages as a result of the fraudulent claims. (Report at 38, citing *Blusal Meats, Inc. v. United States*, 638 F.Supp. 824, 827 (S.D.N.Y.1986)). Judge Pollak based her conclusion that the claims were false within the meaning of the FCA on the "express certification theory," under which a false claim is one that "falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite to payment." *Mikes v. Straus*, 274 F.3d 687, 698 (2d Cir.2001).

The Providers disagree vehemently with these conclusions. In addition to reiterating their basic argument that their claims were properly submitted in accordance with the prevailing, valid regulations, they also argue: (1) that even if the Providers' cost reports were incorrect, they were not "knowingly false" within the meaning of the FCA; (2) that even if the cost reports were false, none of the individual Medicare reimbursement claims filed by the Providers were fraudulent, and therefore no additional penalties can attach to the submission of those claims; and (3) that they cannot be held liable under the FCA because the government did not suffer any monetary loss from their actions. (Pl.

Obj.26–37). Each of these objections is addressed in turn.

### a. "Knowingly False"

■ The Providers first argue that the Report erred as a matter of law in finding that they could be held liable for violations of the False Claims Act because the government has not shown, and cannot show, that the Providers' knew that their submissions were false. Specifically, they assert that a "knowing" submission of a false claim cannot occur: (a) where "there is such ambiguity and lack of clarity in a government policy that it is impossible to know what the governing standard is," and where an "innocent mistake" occurs as a result; or (b) where the action is based on a "dispute[ ] about the meaning of legal provisions or regulation." (Pl.Obj.28, 34). The Providers contend that both of these conditions prevailed during the period of time at issue in this litigation. The Report rejected the Providers' arguments on each of these points, and this court rejects them as well.

■ It is true that FCA liability cannot attach where an incorrect submission results simply from a misunderstanding concerning what the applicable regulations require of a claimant. The record demonstrates, however, that this is not what happened here. While confusion apparently existed on the margins concerning the precise requirements of the new cost-reporting instructions, as indicated by UGS' correspondence with Senator Coats and the Home Care Association of New York,[11] the Providers have not pointed to any evidence that they tried to comply with the new regulations, and somehow blundered in the attempt. Nor do the Providers claim at any point that they were confused by the new instructions.

Instead, the Providers attempt to hide behind the general "abundance of confusion and misdirection" that they contend surrounded the issuance of § 3205 to argue, in effect, that the dispute over the meaning and validity of § 3205 created blanket immunity for everyone ordered to comply with the new interpretation. (Pl.Obj.31).

It is clear from the language of the statute, however, that the focus of this court's analysis must be on what the Providers themselves knew. Under the FCA, the terms "knowing" and "knowingly" mean that a person: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b). Thus, the Providers' submissions were "knowingly false" if the Providers knew, within the terms of any of the above definitions, that they were required to comply with § 3205 in submitting their 1995 and 1996 cost reports, and chose not to do so.

The Providers' own Objections to Judge Pollak's report suggest that they ambled down the first of these paths, gambling they could that comply with the "regulatory directives in *effect at the time of the cost reports'* submission" while ignoring an interpretive directive that they viewed as invalid because it "was not promulgated pursuant to the APA" without incurring liability for certifying that they had complied with all applicable instructions. (Pl. Obj.36–37) (emphasis in original). Astonishingly, the Providers now seek to employ that very gamble as a defense. Their argument is as follows: The Providers thought § 3205 was invalid. As such, even though they were aware that they had been instructed to comply with § 3205, they came to believe that that instruction

---

11. *See* Raffa Decl. Exhibit N ("Rodat Declara- tion" and exhibits).

was not applicable. As a result, when they certified that they had complied with *all* applicable instructions in preparing their 1995 and 1996 cost reports, they did not act with "actual knowledge" that their certification was false because the Providers were certifying only, albeit without making anyone aware of this neat distinction, that they had complied with all portions of the regulations that they felt were "correct and binding." *Id.* This constitutes chutzpah of the highest order. It is not, however, a valid defense to the charge that the Providers knowingly filed false statements. *See United States v. Weiss,* 914 F.2d 1514, 1522 (2d Cir.1990) (holding that a person charged with filing false statements may not interpose a defense that the requirement to which he failed to conform was not validly issued); *United States v. Calhoon,* 97 F.3d 518, 529 (11th Cir.1996) (holding that "while a provider may submit claims for costs that it knows to be presumptively nonreimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption and seeking reimbursement").

This court finds that the Providers knew that § 3205 was part of the governing standard for the submission of HHA cost reports, and nonetheless, in an attempt to game they system, knowingly certified that they had complied with all applicable instructions in compiling their cost reports without attempting to conform their submissions for 1995 and 1996 to that standard. In doing so, the Providers had actual knowledge of the falsity of their certification, or, at best, acted in deliberate ignorance of the truth or falsity of their certification in hewing to the belief that § 3205 was not an applicable instruction. In either case, as the Report correctly concluded, they acted "knowingly" within the meaning of the FCA in submitting their 1995 and 1996 cost reports.

The Providers also argue that even if they "knew" that they had falsely certified that their submissions were compliant, FCA liability is still inappropriate because "disagreement about the interpretation of legal language ... cannot be the basis for a FCA action." (Pl.Obj.33). This court agrees that, as a general rule, unresolved disputes about the proper interpretation of a statute or regulation should not lead to suits under the FCA, at least where a claimant's interpretation of the governing law is reasonable. *See, e.g, Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1477–78 (9th Cir.1996). This court cannot agree, however, that the safe harbor created for those who rely on a reasonable interpretation of an ambiguous provision also should provide protection where the agency responsible for administering the applicable law or regulation has publicly issued a definitive interpretation intended to resolve that ambiguity. The FCA would be rendered toothless overnight if parties claiming federal funds were permitted to rely on any reasonable interpretation of a regulation they might prefer, even if it directly conflicted with an agency's official interpretation of the same law. This court will not countenance such a result. Rather, I believe that FCA liability is inappropriate only where a claimant has *reasonably* relied on its interpretation of the law, and that such reliance becomes presumptively unreasonable once the government has formally declared that it has adopted a different interpretation. The Providers have presented no precedent to the contrary, instead citing a string of cases in which no official guidance of the type provided by § 3205 was available to the FCA defendants. *See, e.g., United States ex rel. Hochman v. Nackman,* 145 F.3d 1069, 1075–76 (9th Cir.1998); *United States ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 463 (9th. Cir.1999); *Hagood,* 81

F.3d at 1477–78. The court therefore rejects the Providers' assertion that FCA liability cannot attach in any case where the meaning of a regulation or statute is disputed. At least where the dispute is between an official agency interpretation and a claimant's inconsistent interpretation, liability under the FCA is appropriate where the claimant has claimed to be acting in compliance with the agency interpretation while actually adhering to its own plainly inconsistent reading of the law.

#### b. The Actual Damages Requirement

■ The Providers' next objection is that they cannot be held liable under the FCA because the government has recouped the nearly $250,000 by which it believes it overpaid the Providers, and therefore has not suffered any financial loss. Without a showing of actual financial loss, the Providers argue, the government has failed to satisfy the Second Circuit's test for recovery under the FCA. (Pl. Obj.27). This argument is also unavailing.

First, the Second Circuit has not decided whether actual financial loss is a necessary element of an FCA claim, having specifically reserved judgment on the question in *Mikes v. Straus*, 274 F.3d at 695. Second, "the weight of authority suggests that there is no damages element." *United States ex rel. Taylor v. Gabelli*, 2004 WL 1719357, at *8 (S.D.N.Y. July 29, 2004). *Compare Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 n. 7 (4th Cir.1999); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 183 (3d Cir.2001); *Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 429 (6th Cir.2001); and *United States v. Medica–Rents Co.*, 285 F.Supp.2d 742, 769 n. 60 (N.D.Tex.2003) (finding no damages element) *with United*

*States ex rel. Schwedt v. Planning Res. Corp.*, 59 F.3d 196, 199 (D.C.Cir.1995); *Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir.1994); *UMC Elecs. Co. v. United States*, 43 Fed.Cl. 776 (1999), *aff'd*, 249 F.3d 1337 (Fed.Cir.2001); *United States ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F.Supp.2d 824, 861 (S.D.Tex.2003).

Third, even some courts that have found that the FCA contains a damages requirement have held that where the government pays out money from the treasury in reliance on a fraudulent claim, and only later is able to recoup those funds, the actual damages requirement has been met because the government has been denied the use of the overpaid money and can no longer use the promise of payment to induce compliance on the part of the claimant. *Young–Montenay*, 15 F.3d at 1043 n. 3. *But see Reagan v. East Texas*, 274 F.Supp.2d at 862 (holding that FCA relator could not recover where the government had already recovered overpayments in full).

The Providers' proposed rule that treble damages are unavailable under the FCA where the government has recouped its losses also would run counter to the policies elaborated by the Supreme Court in *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1975). There, the Court ruled that "in computing the double damages authorized by the Act, the Government's actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source." [12] *Id.* at 316, 96 S.Ct. 523. The Court further explained that this method of computation was a better fit

---

12. At the time of the *Bornstein* decision, the FCA provided for double damages. The Act was amended in 1986 to allow the government to recover treble damages for FCA violations.

with the language and purposes of the Act than the proposed alternative of subtracting recovered overpayments prior to doubling because it "maximizes the deterrent impact of the double-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision." *Id.* at 317, 96 S.Ct. 523. Specifically, the Court sought to avoid a reading of the statute that would "enable [a claimant] to avoid the Act's double-damages provision by tendering the amount of the undoubled damages at any time prior to judgment. This possibility would make the double-damages provision meaningless." *Id.* at 316, 96 S.Ct. 523. The Providers' reading of the FCA would similarly eviscerate the prophylactic value of the current treble-damages provision. For starters, it would diminish significantly the deterrent impact of the provision. It would also make the extent of the claimant's liability dependent on the government's ability to recoup its overpayments rather than on the size of the fraudulent claims, clashing with *Bornstein*'s express statement that the liability of the defrauder should be fixed "without reference to the adventitious actions of other persons." *Id.* at 315, 96 S.Ct. 523. Finally, the Providers' interpretation of the FCA, when combined with the computational rule of *Bornstein,* would produce the anomalous result that a party that received $100,000 from a false claim and then had that payment entirely recouped would face no treble damages penalty. If instead, the government recovered $99,999 from the false claim, however, the claimant would owe $200,001 for committing the same dishonest act under the *Bornstein* damages formula.[13]

*Bornstein* does not command a result in this case, but it strongly suggests that the purposes of the FCA would be best served by allowing the government to recover treble damages under the statute even where the government is able to recoup the sum that was paid out because of the fraudulent claim. On the basis of this guidance, I find that even if the FCA contains an actual damages requirement, that component is satisfied where the government has paid out money in reliance upon the accuracy of a reimbursement claim, and only later recouped the overpayment. The Providers are therefore liable under the treble damages provision of the Act.

### c. Statutory Penalties for Individual False Claims

Finally, the Providers claim that even if their cost-reporting submissions were false within the meaning of the FCA, the government is only entitled to recover penalty fines for the submission of the two cost reports. (Pl.Obj.26, 38). The government asserts, on the other hand, that each UB–92 remittance form submitted by the Providers to claim interim reimbursement for Medicare-eligible visits constituted a separate false claim because the Providers "submitted them with the knowledge that, because they were reporting inflated data in their cost reports, they would be paid on an interim basis at a higher rate ... than they were entitled to be paid." (Def.Resp.24). The government does not allege, however, that any of the UB–92 forms contained false or fraudulent information. Because 31 U.S.C. § 3729(a) provides for statutory penalties of between $5,000 and $10,000 for each false claim, and because the Providers together submitted approximately 8,000 UB–92 forms

---

**13.** This is because the claimant would be assessed a penalty of three times the payment resulting from the false claim (or $100,000 × 3 = $300,000) less the $99,999 recouped by the government, for a total of $200,001 in damages.

during 1995 and 1996, the practical contrast between these two positions could hardly be more stark.

There can be no doubt that each UB–92 submission seeking interim reimbursement was a "request or demand. . . for money or property [for which] the United States Government provides any portion of the money or property which is requested or demanded," and was therefore a separate claim within the meaning of the FCA. 31 U.S.C. § 3729(c). The question that this court therefore must answer is whether the claims made in these UB–92 forms were false. More specifically, do the FCA's statutory penalty provisions apply only if the Providers' explicit claims that they had provided Medicare-eligible services to a Medicare beneficiary were false, or may they also be imposed on the basis of the Providers' implicit claims that they were entitled to a specific sum of money, knowingly inflated by the submission of fraudulent cost reports, for each eligible visit?

This court concludes that the government is not entitled to collect penalty damages for each of the thousands of interim reimbursement claims submitted by the Providers because there has been no allegation that any aspects of the reimbursement claims themselves were false or fraudulent. The UB–92 forms did not require the Providers to certify that their cost report submissions were accurate, instead confining the implied certifications made by signatories to attestations such as that the information "requested by this form" was accurate and complete, that the care provided was medically necessary, that the patient actually received the services claimed on the form, and that documentation of the attending physician's certification is on file. UB–92, HCFA–1450. While it might be argued that the UB–92 forms were false claims because they were

"aimed at extracting money the government otherwise would not have paid," *Mikes v. Straus,* 274 F.3d at 696, it seems too great a stretch to say that these reimbursement claim forms were false or fraudulent because, and only because, the Providers' cost reports were false. Accordingly, this court concludes that the government is entitled to recover statutory penalties under the FCA only for the Providers' submission of "false or fraudulent" cost reports for 1995 and 1996.

### 2. Defendants' Common–Law Claims

The Providers have not separately objected to the Report's conclusion that summary judgment should be granted in favor of the United States on its common law counterclaims of unjust enrichment, payment under mistake of fact, breach of contract and common law fraud, noting only that these claims are "alternative causes of action which are based on the same factual predicate as the FCA allegations," and resting on the recitation of fact and law provided in support of their arguments as to the Secretary's cross-claims under the FCA. (Pl. Obj. 39 n. 50). I agree that it is unnecessary to conduct a separate analysis of the claims that the Secretary has raised under common law. Therefore, for the reasons described in rejecting the Providers' arguments regarding the Secretary's FCA claims, this court concludes that the Secretary is entitled to summary judgment on the common law claims raised in the defendants' cross-motions.

### E. *Damages*

According to the Providers, "it is obvious that the Report's damages recommendation is defective and should be rejected." (Pl.Obj.37). This assertion is nothing short of bewildering, as the Report did not reach an ultimate conclusion on the issue of damages, recommending instead that

"the amount of damages be reserved pending review of this Court's Report and Recommendation and a further submission from plaintiffs, addressing defendants' damage calculations under the False Claims Act." (Report 51–52). This court has now found that the government is not entitled to collect statutory penalties for each of the Providers' reimbursement claims during 1995 and 1996. However, the Report did not address whether the government is entitled to a separate recovery for its common law claims in addition to the trebled damages now granted under the FCA. This case is therefore returned to Judge Pollak for a determination of the Providers' liability under the defendants' common law causes of action, as well as a calculation of the total damages that should be assessed against VNAB and VNAHCS, respectively.

## IV. Conclusion

For the reasons set forth above, the Providers' motions for summary judgment and declaratory relief are hereby DENIED, the defendants' motion for an affirmation of the Secretary's decision is GRANTED, and the defendants' motion for summary judgment on its cross-claims is GRANTED. The parties are ordered to contact Judge Pollak's chambers to set a briefing schedule for the resolution of the outstanding damages issues.

SO ORDERED.